CORNELIUS CALDBECK, Plaintiff-Appellee, *v.* CHICAGO PARK DISTRICT *et al.*, Defendants-Appellants.

First District (4th Division)    No. 79-1110

Opinion filed June 18, 1981.

William J. Harte, Ltd., of Chicago, for appellants.

Edward M. Duthaler and Patrick M. Cummings, both of Victor F. Ciardelli, Ltd., of Chicago, for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendants, the Chicago Park District (CPD) and certain of its officials, appeal from an order of the circuit court of Cook County directing the CPD to reissue plaintiff, Cornelius Caldbeck, a boat slip permit at the Montrose Harbor. The trial court order reverses a CPD decision to revoke plaintiff's previously issued permit. On appeal, defendants contend: (1) the trial court lacked jurisdiction to entertain the complaint for administrative review which sought the issuance of a writ of *certiorari*; and (2) assuming the trial court had the required jurisdiction to proceed as it did, nonetheless the trial court erred in ordering the CPD to reissue a boat slip permit to plaintiff since the decision of the CPD was not against the manifest weight of the evidence.

We reverse and enter judgment for defendants.

*Procedural History*

Plaintiff's complaint, captioned "Complaint at Law for Judicial Review of Administrative Findings and Decision," alleged that, prior to and during 1977, the CPD had issued to plaintiff a permit for slip 39 at Montrose Harbor. In the fall of 1977, plaintiff received notification from the CPD that his permit had been revoked for noncompliance with the rules of the CPD governing assignment of harbor mooring permits. Plaintiff allegedly violated the provision of the code which provides that permits are nontransferable and nonassignable. Plaintiff's complaint seeking administrative review concluded that defendants' decision to revoke plaintiff's permit and not to reissue it was not supported by competent evidence.

On May 17, 1978, the trial court ordered the administrative review action remanded to the CPD for a hearing *de novo*. The trial court's order also required that the CPD file a copy of the transcribed proceedings with the trial court. It is not apparent from the record whether there was compliance with the trial court's ruling.

On return of the matter on July 28, 1978, the trial court, pursuant to its review, reversed the initial decision of the CPD and ordered the CPD to reissue to plaintiff a permit for slip 39 at Montrose Harbor. On August 10, 1978, defendants moved to vacate the trial court's order, arguing that the trial court lacked jurisdiction to decide the case because the Administrative Review Act did not apply.

The trial court granted defendants' motion to vacate the order and

gave plaintiff leave to file an amended complaint petitioning for a writ of *certiorari*. Plaintiff filed his amended complaint which alleged, *inter alia*, that the law fails to provide for a method of review or appeal from the CPD's decision and that consequently plaintiff had no remedy except by order of the court allowing a writ of *certiorari* to issue directing defendants to certify and bring the record of the CPD's proceedings before the trial court to determine whether the CPD's decision was against the manifest weight of the evidence. Defendants elected to stand on their motion to dismiss the complaint which the trial court had denied. Thereupon, the trial court entered a default judgment in favor of plaintiff and directed the slip permit to reissue.

Pursuant to defendants' motion to reconsider the order, the trial court, on May 22, 1979, vacated the default judgment and ordered defendants to deliver to it the record of the hearing *de novo*. On June 4, 1979, the trial court again entered judgment for plaintiff and again ordered defendants to issue plaintiff a permit for boat slip 39.

*The Hearing*

The CPD's decision to revoke plaintiff's permit and not to reissue another was based on plaintiff's violation of a CPD rule which provides that harbor mooring permits are nontransferable and nonassignable. The CPD maintained that plaintiff failed to accurately and fully disclose the ownership of the boat, "Good Guy Jim," for which the slip permit had been issued in 1976.

At the hearing, Wallace Roth, plaintiff's acquaintance, testified that he sold a 38-foot boat named the "Tico IV" to plaintiff in September 1976. Title to the boat was transferred to plaintiff by a bill of sale in January 1977. Plaintiff made installment payments of the purchase price of the vessel by check. Roth denied that he had any business relationship with Bill Boyle, and he denied that Bill Boyle was a purchaser of the boat.

Roth further stated that delivery of the boat took place at U-Banks Boat Yard in Dolton. At that time, Roth did not have a boat slip in a Chicago Park District harbor; the boat was moored at the Dolton Marina.

Gerald Pfeiffer, Director of Marine for the CPD, testified that he was in charge of the issuance and the renewal of permits for boat moorings. Pfeiffer then examined several permits which had been issued to plaintiff. The first permit, dated 1969, registered plaintiff and Robert Weiss as applicants for a mooring for a boat called "Saddle Free." This application contained both Weiss' and plaintiff's signatures. Every yearly application until 1974 contained the signatures of both Weiss and plaintiff. In 1974, plaintiff was the sole applicant for a permit for a boat called "Charlie Brown II." Pfeiffer asserted that only plaintiff's signature appeared on the application. He also noted plaintiff did not sign the application for the

two previous years. In 1975, plaintiff's application for a slip permit for "Charlie Brown II" showed only plaintiff's signature.

Pfeiffer then explained that in 1976, the CPD began sending invoices which instructed applicants to indicate any changes with reference to vessel ownership or place of residence. In 1976, plaintiff's invoice indicated he had purchased a new boat named the "Good Guy Jim" of Holland, Michigan from Peter Burger. An additional paper, the "notice of change" contained plaintiff's and James McCall's name. That year, the CPD did not require plaintiff to sign a yearly permit; "it was strictly by invoice." In 1977, plaintiff's invoice listed a new boat, named "The Wrangler," and plaintiff as sole owner. Thereafter, plaintiff's permit was not renewed.

Pfeiffer also stated that he had a conversation with plaintiff wherein he explained to plaintiff that a permit holder cannot "add partners because that breaks the chain of renewal." According to Pfeiffer, the chain of renewal was broken "when plaintiff involved himself in whatever manner with McCall with the 'Good Guy Jim.'" Pfeiffer informed plaintiff that he had visited the "Good Guy Jim" at least 12 different times and never saw plaintiff aboard. On each occasion, he met a man identifying himself as a workman, whom he later learned was McCall. Pfeiffer also informed plaintiff that:

> "[He] had found McCall and the 'Guy Jim' in another situation in Burnham Harbor very similar to what we felt was the same situation in Montrose Harbor [with] himself. [The situation was that] the individual had * * * made a habit of finding people who for one reason or another did not have a boat as in the case of [plaintiff] and that Mr. McCall seemed to be very fortunate to find people who had water available that they could come under the umbrella of and use a particular stall for a season or whatever."

Plaintiff testified that until 1974, he and Robert Weiss applied for a mooring permit for their co-owned boat, the "Charlie Brown." In 1975, plaintiff acquired a new boat, the "Charlie Brown II," which later sank in a boating accident. Plaintiff stated first, that he had owned that boat two years, until 1976, and then he said that he had owned it until 1975. He then acquired "Good Guy Jim" the following year. James McCall, plaintiff's "partner," was co-owner of the "Good Guy Jim."

Plaintiff asserted he bought the boat "from a bank" in Holland, Michigan. The purchase price was $11,000. McCall alone signed the note from the bank. Plaintiff paid McCall "as we went along. * * * About $1,500 [that] same year. I didn't get along with him." When they parted company, plaintiff lost the $1,500; McCall did not "buy out" his interest.

Plaintiff further testified that after he purchased the boat, "Good Guy Jim," in 1975, he notified the CPD that both he and McCall were owners.

He showed the CPD his registration form with both names on it. He alone signed the permit form; he did not ask McCall to sign it. Plaintiff also asserted that his name was on the certificate of ownership from the bank. His name was not included on the insurance policy because he had been involved in a boating accident. The insurance broker suggested to him that the insurance policy would be cheaper if he was not included on the policy.

The partnership and co-ownership with McCall lasted until 1976. Plaintiff then told McCall he did not want any part of the boat and he stopped making payments to him. He then bought another boat, called "the Wrangler," from an attorney he had known "for years." This boat originally was called the "Tico IV."

Plaintiff acknowledged that he had always had a telephone on each of his boats but he asserted that he never had the telephone listed in his name. Plaintiff stated that he allowed a friend, Bill Boyle, to purchase telephone service for plaintiff's boat and list the telephone in Boyle's name even though Boyle was not a co-owner of the boat. Plaintiff only required that Boyle pay for the telephone service.

James McCall testified that he owned the "Good Guy Jim," which had been purchased from Pete Burger in 1975. McCall described plaintiff as his "partner," and he explained the financial arrangement they agreed upon to purchase the "Good Guy Jim." They had a verbal agreement to split expenses. The $11,000 purchase price was financed by the Mount Greenwood Bank, and McCall alone signed the note. McCall agreed to make all the payments on the note, and plaintiff was supposed to "pick up the expenses." These expenses amounted to the cost of wood materials for boat repairs which McCall made. McCall paid the insurance premiums. At the end of the 1976 season, the "partnership" dissolved. Plaintiff paid McCall $1,115 and McCall became the sole owner of the boat. McCall further testified that he and plaintiff both had registered the boat with the State and had signed the change of ownership notice slip which had been sent to the CPD.

McCall also stated that the boat was moored at slip 39 during the 1976 boating season and, in 1977, it was moored at Burnham Harbor. On the advice of his counsel, McCall refused to answer further questions with respect to the circumstances which led him to moor his boat at Burnham Harbor during years subsequent to his partnership with plaintiff.

William Engler, an insurance broker residing in South Holland, testified that he did not know plaintiff. He knew McCall because he had insured his boat from 1975 to the present. As of July 25, 1977, Robert Brooks also was listed as an owner. On November 11, 1975, McCall had requested that plaintiff's name be added as a partner on the insurance

policy. He then called McCall and requested plaintiff's boating experience and claimed losses. McCall then told him "to forget it." Engler admitted that a person who had had a boating accident would have a more difficult time obtaining insurance than one who had not had a boating accident. McCall never told Engler about plaintiff's boating experience.

William Boyle refused to answer any questions.

OPINION

I

Defendants first contend that the circuit court lacked jurisdiction to issue the writ of *certiorari* directed to the CPD to issue the slip permit and, therefore, the CPD's decision to refuse plaintiff a mooring slip is not reviewable. We disagree.

In *Quinlan & Tyson, Inc. v. City of Evanston* (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65, the court noted that although the Administrative Review Act did not apply to the case there, it did not necessarily follow that the circuit court was without jurisdiction. The court explained that:

"The Administrative Review Act did not expand the subject matter jurisdiction of the circuit courts. Circuit courts have historically had jurisdiction to review administrative decisions as provided by law. (Ill. Const. (1870), art. VI, sec. 9; Ill. Const. (1970), art. VI, sec. 9.) The purpose of the Act was to dispense with the use of mandamus, *certiorari*, injunction and other actions as a means of reviewing the decisions of administrative agencies, and thus to provide a single uniform method of review. (*People ex rel. Builders Supply & Lumber Co. v. Village of Maywood*, 22 Ill. App. 2d 283, 160 N.E.2d 689.) The Administrative Review Act provides a simple single procedure for a review from specified administrative decisions, but it was not intended to be a trap for the unwary or to establish a bar to relief. (*Chestnut v. Lodge*, 34 Ill. 2d 567, 216 N.E.2d 799.) * * *.

* * *

As the cases decided before enactment of the Administrative Review Act make clear, the proper method for review of administrative decisions was by writ of *certiorari*. (*People ex rel. Elmore v. Allman*, 382 Ill. 156, 46 N.E.2d 974.) And although the Administrative Review Act has replaced *certiorari* for review of State administrative agencies, it appears *certiorari* has remained the appropriate method for review of municipal administrative agencies." (25 Ill. App. 3d 879, 883, 324 N.E.2d 65, 69.)

The reviewing court concluded that the circuit court had jurisdiction to

issue a writ of *certiorari* directing that certain action be taken. See also *Nowicki v. Evanston Fair Housing Review Board* (1975), 62 Ill. 2d 11, 338 N.E.2d 186.

■■ It is clear from the foregoing that the proper procedure to obtain judicial review of the CPD's decision was by way of issuance of common law writ of *certiorari*, since no other means of review was available. We conclude, therefore, that the circuit court had jurisdiction to review the CPD's decision and to issue, thereafter, its writ of *certiorari*.

## II

Defendants next contend that even if the trial court had the jurisdiction to issue the writ, its ruling to do so should be reversed because the CPD's refusal to issue plaintiff a boat slip permit was not against the manifest weight of the evidence. We agree.

Section 30—3.1(b)(2) of the Code of Ordinances of the Chicago Park District (Chicago Park District Ordinances Regulating Use of Harbors §30—3.1(b)(2)) provides that a permit may be denied or revoked where the application contains materially false or misleading statements, or the applicant in the past has filed an application containing materially false or misleading statements. Section 30—3.1(3) provides that a permit may be revoked if, on prior occasions, the applicant has been found guilty of violating the CPD's regulations. Section 30—3.1(g)(3) provides that permits are nontransferable and nonassignable, and the Chicago Park District Rules Regulating the use of harbors provides in pertinent part:

> "Each permit shall apply only to the use of a particular slip, or mooring place, and to a specified owner and vessel, all of which shall be designated in the permit, and such permit shall not be transferable to another owner, mooring place, or slip. In the event that a transfer takes place in the case of vessel ownership, mooring place, or slip, the permit herein granted shall become void and there shall be no refund of permit fee."

The defendants maintain that the evidence fairly tends to support the CPD's refusal to issue plaintiff a permit. Defendants assert that the evidence disclosed that plaintiff lost his boat in an accident in 1975. For the 1976 season, plaintiff arranged to renew his permit for a new boat, the "Good Guy Jim" and "brokered" the permit to McCall who was the true owner of the "Good Guy Jim." The following year, plaintiff obtained a new boat, and consequently McCall made a similar arrangement with someone else to moor his boat at Burnham.

■■ In a *certiorari* proceeding, the court must ascertain whether the agency had jurisdiction, whether it proceeded according to law and acted on the evidence, and whether there is anything in the record which fairly tends to sustain the action of the agency. (*Quinlan & Tyson, Inc. v. City of*

*Evanston* (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65.) The reviewing court may not weigh the evidence or judge its probative value but rather only must determine whether the decision is supported by the evidence or is manifestly against the weight of the evidence. *Kallas v. Board of Education* (1973), 15 Ill. App. 3d 450, 304 N.E.2d 527.

In the instant case, Pfeiffer, the Director of Marine, testified that he visited the boat "Good Guy Jim" at least 12 different times and found only McCall present each time. During these visits, McCall identified himself as a worker, not an owner. McCall's name alone appeared on the bank note which was used to obtain the funds to purchase the "Good Guy Jim." Only McCall's name appeared on the insurance policy for the boat.

■■ We believe the evidence fairly tends to support the defendants' view that the "partnership" between McCall and plaintiff and plaintiff's brief ownership interest acquired by "picking up" some lumber expenses was, in effect, a de facto assignment of plaintiff's mooring permit to McCall. As noted previously, if there is anything in the record which fairly tends to sustain the action of the agency, the agency's action must be sustained. (*Quinlan & Tyson, Inc. v. City of Evanston* (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65.) In our view, the circuit court erred by substituting its judgment for that of the CPD. Consequently, the ruling of the trial court must be reversed.

The judgment of the circuit court of Cook County is reversed.

Reversed.

ROMITI, P. J., and JOHNSON, J., concur.