CHARLENE RAITZIK, Plaintiff-Appellant, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—03—3574

Opinion filed March 18, 2005.

Kathrin A. Koenig and Gwendolyn D. Reeves, both of Chicago Teachers Union, of Chicago, for appellant.

Ruth M. Moscovitch and Lee Ann Lowder, both of Board of Education of City of Chicago, of Chicago, for appellees.

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff-appellant Charlene Raitzik (plaintiff) was discharged from her employment as a tenured schoolteacher after receiving an unsatisfactory rating following a 90-day remediation period. Plaintiff sought review of this action, and defendant-appellee hearing officer Larry Drury (hearing officer) recommended that she be reinstated with full back pay. Defendants-appellees Board of Education of the City of Chicago, Michael Scott, Norman Bobins, Dr. Tariq Butt, Gene R. Saffold, Avis Lavelle, Alberto Carerro, Clare Munana, Arne Duncan, and the Illinois State Board of Education (collectively, Board) reviewed this recommendation, disagreed that the evidence presented supported it, and upheld plaintiff's termination. The trial court agreed with the Board, finding that it did indeed have cause for the discharge. Plaintiff appeals, contending for various reasons that the hearing officer's recommendation must be upheld. She asks that we reverse the Board's decision and reinstate her with full back pay and other benefits to which she would have been entitled. We affirm.

## BACKGROUND

The following has been gleaned from the record on review, which consists in part of testimony before a hearing officer and various documents and exhibits.

Plaintiff was a teacher for some 25 years. Since 1990, she has been assigned to Pulaski Fine Arts Academy, a Chicago public school, and obtained tenure. Robert Alexander was named principal of Pulaski in 1990; he was plaintiff's supervisor and was required to observe and evaluate her performance, filling out a form noting strengths and weaknesses and giving ratings ranging from (lowest to highest) unsatisfactory, satisfactory, excellent and superior. In brief, prior to the 2000-01 school year, plaintiff received a majority of good ratings. Plaintiff's first assignment was to teach eighth-grade math and science, and Alexander gave her an excellent rating because she was a new teacher with a difficult class. However, Alexander noted weakness in her rapport with students, who would not cooperate with her, and

in her communication with parents. Plaintiff was then assigned to sixth grade, and later second grade, in the hope that she would be better able to control younger children. This proved not to be the case and Alexander reassigned plaintiff to sixth grade. In 1993 and 1994, she received satisfactory ratings and in June 1995, an excellent rating. In December 1995, plaintiff received an unsatisfactory rating with Alexander noting that she was not maintaining a task-oriented or orderly classroom, was not carrying out discipline procedures and was not motivating the students. Plaintiff received a second unsatisfactory rating in June 1996, and a 90-day remediation plan was put into effect to assist her in improving her classroom skills. This period was extended twice before plaintiff successfully completed the plan and raised her rating level to satisfactory. Plaintiff later received two excellent and one satisfactory rating, but with notes that her classroom management skills and relationship with the students still needed improvement.

At the beginning of the 2000-01 school year, Alexander held an orientation meeting which included a review of the teacher evaluation process. Pulaski teachers were required to sign a form stating that they attended the meeting, that they received the appropriate handbooks and that the evaluation and remediation process had been explained to them. Plaintiff attended this meeting on September 22, 2000, and signed the form.

Alexander evaluated plaintiff's classroom on October 19, 2000, and January 8, 2001. On the evaluation form Alexander filled out for his October 19, 2000, visit, he noted that while plaintiff exhibited strengths such as a willingness to implement new teaching methods and maintaining lesson plans/grade books, she was not eliciting the cooperation of her students, she did not display student work in her classroom, she lacked interpersonal skills to gain student "good will" and her classroom was "a mess," especially her desk. On the form he filled out for the January 8, 2001, evaluation, Alexander noted that plaintiff was teaching from month-old or incomplete lesson plans, that the students' assignments were undated, that her grade book had a large number of unfinished or "0" assignments, that her attendance book was incomplete, that the students were ignoring her and having their own conversations, and that class discussion "often got out of control." Alexander further noted that plaintiff's own punctuality was weak, that she was not eliciting cooperation from the students, that her room was not decorated for the students and that she was not enforcing an assertive discipline plan. After each evaluation, Alexander met with plaintiff to discuss his observations; plaintiff signed the evaluations, indicating that she had met with Alexander and had received the evaluation forms.

Alexander testified that he observed a lack of respect on the part of the students toward plaintiff. Only a few members of her class would participate and/or complete assignments; most other students were defiant of her and refused to do the required work, and she could not refocus them properly. He stated that several students had come to him to complain that plaintiff had lost their test papers and homework assignments and that she was requiring them to repeat work they had already done. Alexander also noted an extensive number of misconduct reports plaintiff had been submitting to the school disciplinarian with respect to her students, including the use of swear words, offensive gestures, refusal to do work, students walking around the classroom or in the hallway instead of being at their desks, and fighting. Alexander testified that many of these reports related to minor misconduct plaintiff was supposed to handle herself as part of the assertive discipline plan each teacher was required to implement and enforce in his or her classroom.

Based on these observations, Alexander issued plaintiff an E-3 Notice on January 24, 2001, rating her teaching performance as unsatisfactory. Alexander listed seven reasons for this rating:

"1. Failure to establish positive learning expectations for students.

2. Failure to maintain up-to-date records of pupil achievement.

3. Failure to periodically evaluate students and show evidence of student progress.

4. Failure to maintain reasonable conduct within the classroom consistent with the provisions of the Uniform Discipline Code.

5. Failure to practice fairness in teacher-pupil relationships.

6. Failure to use sound professional judgement.

7. Failure to provide a safe, orderly and nicely decorated learning environment for the students."

Alexander assigned Serena Peterson to be the consulting teacher for plaintiff during the applicable 90-day remediation process. Peterson was to help plaintiff meet various goals to raise her rating to at least satisfactory by providing observation and advice about how plaintiff could improve her teaching performance. Peterson had worked at Pulaski for 11 years, had received superior ratings for the last 5 years, taught the same subjects as plaintiff and had her office on the same floor as plaintiff. Peterson accepted the assignment on January 25, 2001.

Alexander, Peterson and plaintiff met to discuss the implementation of a remediation plan. The plan listed what Alexander found to be plaintiff's five primary deficiencies:

*"DEFICIENCY #1*

[Plaintiff] fails to maintain reasonable student conduct consistent with the provisions of the Uniform Discipline Code.

\*\*\*

*DEFICIENCY #2*

[Plaintiff] fails to establish positive learning expectations for students and to practice fairness in teacher/pupil relations.

\*\*\*

*DEFICIENCY #3*

[Plaintiff] fails to evaluate pupil progress and maintain up-to-date records of pupils' achievements.

\*\*\*

*DEFICIENCY #4*

[Plaintiff] fails to use sound professional judgment.

\*\*\*

*DEFICIENCY #5*

[Plaintiff] fails to provide a safe, orderly, clean, and nicely decorated learning environment for the students."

Bullet points containing a variety of suggestions were included after each deficiency, plaintiff's implementation of which would assist her in improving her classroom skills and in raising her rating; these bullet points totaled over 50 in number. The plan also made clear that Alexander, as the principal, would be the one to conduct the final evaluation of her progress; Peterson would intervene, work with plaintiff and keep a log of her progress; and the ultimate responsibility to complete the requirements of the plan would belong to plaintiff. Under the section entitled "Timeline for Completion," the plan stated that it would become effective on February 2, 2001, that plaintiff had 90 school days from that date to complete the plan (to September 26, 2001, bridging into the next school year), that she would be evaluated monthly for the first six months of this period and quarterly for six months thereafter, and that an unsatisfactory rating at the end of the 90 days may result in dismissal proceedings. Plaintiff, Peterson and Alexander signed the remediation plan.

Soon after, Peterson began working with plaintiff regarding the plan. She conducted multiple observations of plaintiff's classroom (almost weekly) during the months encompassing this period. With respect to the advice she gave plaintiff during this time, Peterson testified that she made herself available to her by phone, e-mail and in person before, during and after school, and sometimes even at home. Peterson taught her how to improve her lesson planning by using a computer program and offered her computer to plaintiff anytime she wanted to use it. Plaintiff asked Peterson to teach her class so she could observe Peterson's teaching methods as applied to plaintiff's

students; Peterson was quite able to keep the students on task. Peterson suggested that plaintiff reconfigure the students' desk arrangement to instill more order. Peterson also reviewed plaintiff's grade book and pointed out that she should be making entries every day for the daily homework assigned. Peterson provided substitute teachers on various days so plaintiff could leave her classroom and observe Peterson's teaching style during her class time. Peterson also recommended that plaintiff clean up her room and replace her old faded bulletin boards to create a better learning environment for the students. Peterson further suggested that plaintiff rely less on the teacher's answer manual, move around the classroom and interact with all the students, not simply the ones who raised their hands. Peterson also discussed with plaintiff ways she should try to deal with student misbehavior, including having the students enter into "contracts" and referring her to other teachers who had successfully used this tool.

As the remediation period progressed, Peterson noted little improvement in plaintiff's classroom skills or relationship with her students, and that plaintiff did not implement her suggestions. Peterson observed that during class time, plaintiff rarely progressed beyond reviewing homework. Plaintiff also spent class time grading assignments, or on one occasion loading disks on computers, instead of presenting actual lessons to the students. Plaintiff oftentimes did not have a lesson plan prepared for the day. As a result, few students paid attention or completed assignments and there was little new instruction. Plaintiff's grade book remained blank or contained many failing grades. Peterson commented that there was no forward progression with the teaching material, "no higher-level thinking was going on," and many of plaintiff's lessons were boring and lacked objective. Peterson further observed plaintiff's relationship with the students. Several times, she noted that students misbehaved during class and though plaintiff would sometimes try to correct them, these situations became worse. During one classroom observation, a student became so disruptive that Peterson "couldn't take it" and reprimanded him herself. Plaintiff was still sending a large amount of students to the school disciplinarian for minor behavioral infractions which she should have been controlling herself. On one occasion, plaintiff asked Peterson to handle the discipline of a student who swore in her class. On another occasion, plaintiff ate lunch during her observation of Peterson's class and then began falling asleep.

Alexander observed plaintiff in her classroom eight times during the remediation period, completing a Classroom Teacher Visitation form and postobservation conference with plaintiff for each observation; plaintiff signed every observation form. Alexander observed

plaintiff first on February 16, 2001, and noted that she did not have a lesson plan, her record keeping was poor and many students were still not handing in homework. The class did not progress beyond homework review, only half of her students were attentive, and those who were working were not being supervised or directed by plaintiff. Alexander next observed plaintiff on March 13, 2001, and noted some improvement, especially in dividing her lesson between review and new work and communicating with students. However, there were still many failing grades in her grade book and she was only calling on students with raised hands. Alexander observed plaintiff on March 22, 2001, finding that she had entered only a few grades in her grade book since his last observation and only a few students were participating in the class. On April 3, 2001, Alexander observed that during the class, plaintiff was trying to complete report cards and teach at the same time. Alexander asked plaintiff to get up and teach. He noted that the students were "off task," misbehaving and inattentive, and that plaintiff was not asking effective questions to teach the lesson. Alexander described this class as "deadly boring" and a "waste of time."

Before his next observation, Alexander held a conference with Peterson and plaintiff on April 26, 2001, and discussed how plaintiff was doing under the remediation plan, Peterson's suggestions for lessons and behavior management, and plaintiff's lack of an assertive discipline plan. Alexander then observed plaintiff on April 30, 2001, again noting continued blanks and failing grades in her grade book and few students participating. Plaintiff also did not have a lesson plan prepared for that day. On May 16, 2001, Alexander's last visit before the end of the 2000-01 school year, plaintiff asked the students to turn to a page in their books and get out their homework when the students protested that page had never been assigned. Class was slow to start and no new material was taught. Alexander's last two observations came during the 2001-02 school year. On September 13, 2001, Alexander noted that while plaintiff had improved in some respects such as more grades in the grade book and a complete lesson plan, she spent time arguing with one student and loading computers instead of teaching the class. Of 12 students left to work independently, only 3 were actually working; Alexander testified that the rest were talking and the class was "a waste of time, disorganized, unproductive" and misbehavior was "pervasive." Alexander stated that in his observations of all the sixth-grade classes at Pulaski, the way these students acted in plaintiff's class was "neither ordinary nor acceptable" and that they were not "misbehaving in [those] way[s] toward other [sixth-] grade teachers."

Before his final observation, Alexander scheduled another meeting with plaintiff and Peterson due to what he had seen on September 13, 2001. Alexander and Peterson made further suggestions to plaintiff about her classroom and student behavior management. Alexander's last observation of plaintiff was on September 26, 2001—the 90th and final day of the remediation period. Alexander noted that plaintiff asked some "evocative" questions and properly handled erroneous answers. However, again, there were only a few assignments noted in plaintiff's grade book, she was not implementing the assertive discipline plan or the lesson plan she was supposed to be using that day, she called on only four or five students exclusively, and she did not explain the homework assignment for the next class, which she assigned while shouting over students after the class period had ended.

On October 11, 2001, Alexander met with Peterson to discuss her observations of plaintiff during the remediation period. Peterson shared them as well as her consulting teacher's log documenting her visits and interaction with plaintiff during the period. Peterson testified that she told Alexander she believed plaintiff was not managing her students properly, keeping their attention or following a lesson plan; instead, throughout the period, students were misbehaving without reprimand and plaintiff was consistently using class time to grade homework rather than to teach. Peterson also noted that plaintiff did not implement any of the suggestions she had given during the period, including cleaning her bulletin boards and desk. Peterson had volunteered her students to assist plaintiff in this task, but no progress was made beyond that on plaintiff's part. In addition, though Peterson made herself available before, during and after school and answered all the notes and questions plaintiff submitted to her, plaintiff complained about after-school meeting times and called Peterson only once or twice during the summer break. Alexander sent plaintiff a letter stating that this meeting with Peterson had taken place.

On October 12, 2001, Alexander sent plaintiff a letter notifying her that after 90 days, she had failed to complete the remediation plan with a satisfactory or better rating. The letter further stated that, due to her lack of sufficient progress, her performance was not remediable and that he would be recommending her dismissal for cause to the Board. Plaintiff signed the letter, stating that she had received and reviewed it, albeit under protest. On October 22, 2001, Alexander filled out a Teacher Evaluation Review, listing the dates of the remediation period, the dates of his observations and the dates of his post-observation conferences with plaintiff. As "strengths," he listed that plaintiff had improved her grade book in number of assignments and

orderliness. As "weaknesses," Alexander commented that plaintiff was inconsistent in her lesson plans, did not implement an assertive discipline plan, and was not taking measures to correct student behavior and respect. Alexander gave plaintiff a final rating of unsatisfactory. The Board approved plaintiff's dismissal for cause.

Plaintiff sought review of her dismissal from a hearing officer. She testified that she believed Alexander instituted this whole process due to a confrontation she had with him in the spring of 2000; a student vandalized plaintiff's car while on school property and instead of reporting it to Alexander, plaintiff reported it to his supervisor. Plaintiff described that Alexander was upset that she went "over his head" with the matter. However, during the remainder of her testimony, plaintiff acknowledged that she had understood the remediation plan, had received all of Alexander's Classroom Teacher Visitation forms reflecting his observations of her class, and had attended each postobservation conference with him to discuss his comments. In brief, with respect to her grade book, plaintiff stated that there were few grades because students were not completing their work and she was giving them extensions; she also gave grades she believed the students deserved, giving zeros or F's if there was no name on the assignment or it was incomplete. With respect to her lesson plans, she insisted that her classroom computer was broken and she did not have a compatible computer at home to make lesson plans on the same program Alexander preferred; however, she admitted that the school library had free computers always available for her use. Plaintiff testified that she did implement an assertive discipline plan, the "gist" of which was that students were to raise their hands, remain seated, be "orderly," and respect each other. She disagreed with the accuracy of many of the entries in Peterson's consulting teacher's log regarding her observation of plaintiff's classroom. She stated that Peterson was not always available for consultation and alleged it was Peterson, and not Alexander, who improperly made the final evaluation rating her as unsatisfactory.

Based upon this testimony, as well as that of Alexander and Peterson among others, the hearing officer concluded that plaintiff should be reinstated at Pulaski. While he acknowledged that the law allows for just two classroom visits by a principal as a sufficient basis upon which to issue an E-3 Notice as occurred here, the hearing officer found this to be "troubling," especially for a tenured teacher. He also found it "significant" that plaintiff, who with one exception had received excellent or satisfactory ratings since 1990, was now being dismissed. While the hearing officer concluded that Peterson's log was "generally accurate" and that she was available to plaintiff as much

as possible, and that Alexander did not exhibit any "retaliation or bias" in his testimony, he noted that plaintiff's students had scored above average on standardized tests, the second-highest among sixth graders at Pulaski. Specifically, and relying on *Board of Education of Community Consolidated School District No. 54 v. Spangler*, 328 Ill. App. 3d 747 (2002), the hearing officer reviewed the five primary deficiencies Alexander alleged against plaintiff in the remediation plan and found that some were not proven by the Board, some were proven but only in part, and none were "serious or grievous" enough to merit dismissal.

After considering the hearing officer's decision, the Board issued a lengthy unanimous opinion and order rejecting it and confirming plaintiff's dismissal. The Board found that Alexander employed proper procedures for the issuance of the E-3 Notice and the remediation process, that plaintiff's teaching performance warranted issuance of the E-3 Notice due to "chronic classroom management problems," and that it had been proven beyond a preponderance of the evidence that plaintiff failed to satisfactorily complete a remediation plan. The Board further found *Spangler* distinguishable and instead reviewed at length the Illinois School Code (105 ILCS 5/34—1 *et seq.* (West 2000)) (School Code), finding that Alexander had complied in all respects. The Board ultimately concluded that plaintiff's failure to raise her rating constituted cause for her dismissal, which was otherwise warranted.

Plaintiff then filed a complaint for administrative review, appealing the decision of the Board to the trial court. Reviewing the facts of the cause and the applicable standard of review, the court first found that the Board's findings of fact were not contrary to the manifest weight of the evidence. It noted no procedural violations in plaintiff's dismissal and that she did indeed fail to raise her rating as required under the remediation process, which is cause for dismissal. Second, the court found that the Board's findings of fact provided a sufficient basis for its conclusion that cause for plaintiff's discharge existed. The court affirmed the Board's decision and dismissed plaintiff's complaint for administrative review.

## ANALYSIS

Plaintiff makes several related contentions upon review, all calling for the reversal of the Board's decision and her reinstatement. Her primary assertions are that the Board, through Alexander, failed to follow the proper dismissal procedure, thereby denying her due process rights and rendering her dismissal void; that her teaching performance did not warrant the issuance of the E-3 Notice; and that the Board

failed to prove she did not satisfactorily complete the remediation plan. Plaintiff also alleges that the Board failed to prove that her dismissal was for cause and, because the hearing officer's recommendation was pursuant to "applicable authority," it must be upheld. In applying the appropriate standard of review for the administrative decision rendered here, we will address each of these contentions as they relate accordingly. It is our conclusion that the decision below was proper in all respects.

■ Pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)), our review of an administrative decision to discharge an employee requires a two-step approach. See *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983); *Yeksigian v. City of Chicago*, 231 Ill. App. 3d 307, 310 (1992). First, we must determine whether the Board's findings of fact and decision were against the manifest weight of the evidence. See *Walsh*, 96 Ill. 2d at 105; *Yeksigian*, 231 Ill. App. 3d at 310. Second, we must determine whether those findings sufficiently support the Board's conclusion that cause for discharge or dismissal existed. See *Walsh*, 96 Ill. 2d at 105; *Yeksigian*, 231 Ill. App. 3d at 310. Before we employ this two-step analysis herein, we make clear that we, as a reviewing court, may not interfere with a board's discretionary authority but, rather, may only review the decision reached by the board to determine solely whether it is against the manifest weight of the evidence. See *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648, 653 (1983), citing *Caldbeck v. Chicago Park District*, 97 Ill. App. 3d 452, 458 (1981); see also *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996).

### A. Part I: Manifest Weight of Evidence

■ In determining whether the Board's findings of fact are against the manifest weight of the evidence, we examine only the final decision of the Board—the agency charged with the administration and enforcement of the School Code which governs dismissal—not the decision of the trial court, nor that of the hearing officer, which is merely a recommendation to the Board. See *Hearne v. Chicago School Reform Board of Trustees*, 322 Ill. App. 3d 467, 475 (2001) (Board is vested "with the final administrative decision on teacher *** removal"); see also *Daniels v. Police Board*, 338 Ill. App. 3d 851, 858 (2003). The Board's findings are considered to be *prima facie* true and correct, and we may not reweigh the evidence or make any independent determinations of fact. See *Abrahamson v. Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Thus, we may not substitute our judgement for that of the Board, and reversal of the Board's decision is not justified simply because the opposite conclusion is reasonable or

because we might have ruled differently. See *Abrahamson*, 153 Ill. 2d at 88.

Instead, in order for us to find that the Board's decision is truly against the manifest weight of the evidence, we must be able to conclude that " 'all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous' (*Daniels v. Police Board*, 37 Ill. App. 3d 1018, 1023 (1976)) and that the opposite conclusion is clearly evident." *O'Boyle*, 119 Ill. App. 3d at 653, citing *Jenkins v. Universities Civil Service Merit Board*, 106 Ill. App. 3d 215, 219 (1982); see also *Abrahamson*, 153 Ill. 2d at 88 (Board's decision is against manifest weight "only if the opposite conclusion is clearly evident"); *Yeksigian*, 231 Ill. App. 3d at 310 (Board's decision is not against manifest weight "unless the opposite conclusion is clearly evident [citation] and no rational trier of fact, viewing the evidence in the light most favorable to the [Board], could have agreed with the [Board's] determination"). This is an exacting standard, and if there is anything in the record that fairly supports the Board's conclusion, it is not against the manifest weight of the evidence and must be sustained. See *Finnerty v. Personnel Board of the City of Chicago*, 303 Ill. App. 3d 1, 12 (1999) (if there is evidence in record to support Board's decision, it must be affirmed).

Our review of the record leads us to conclude that the Board had before it sufficient evidence to support its findings here.

### Plaintiff's Dismissal Was Not Void

■ With respect to plaintiff's contention that Alexander and the Board failed to follow procedure and thereby denied her due process rights, neither the hearing officer nor the Board (nor the trial court, for that matter) found any such violation and we, in reviewing the applicable law in relation to the facts of this cause, wholeheartedly agree. Plaintiff makes numerous assertions of violations, claiming that the Board violated the School Code when Alexander failed to issue her ratings and evaluations once every 30 days for the 90-day remediation period, when Alexander failed to conduct an observation of plaintiff's classroom at the end of the period, and when Peterson remained "unavailable" to assist her for weeks. Plaintiff also claims that the Board violated the Illinois Administrative Code (23 Ill. Adm. Code § 50.55 (2000)) (Administrative Code) when it failed to indicate on the remediation plan what days she would be observed by Alexander, when Alexander failed to notify Peterson of plaintiff's ratings after each of his observations, when Alexander did not properly complete the observation forms, and when Alexander used Peterson's log to make a

determination about her remediation. None of plaintiff's claims are meritorious.

First, with respect to her three allegations of School Code violations, section 24A—5(h) makes clear that:

> "evaluations and ratings [will occur] once every 30 school days for the 90 school day remediation period immediately following receipt of a remediation plan provided for under subsections (f) and (g) of this Section; provided that in school districts having a population exceeding 500,000 there shall be monthly evaluations and ratings for the first 6 months and quarterly evaluations and ratings for the next 6 months immediately following completion of the remediation program of a teacher for whom a remediation plan has been developed." 105 ILCS 5/24A—5(h) (West 2000).

The statutory words "provided that" clearly indicate that there are two different time frames for teacher evaluations, depending on the size of the school district involved: once every 30 days for the 90-day period for schools in a district with a population of less than 500,000, and monthly for the first 6 months of the period (and quarterly for 6 months after completion of a plan) in a district with a population of more than 500,000. Pulaski is part of a school district with a population exceeding 500,000; thus, Alexander was required to perform monthly evaluations of plaintiff during the first six months of the remediation period, and thereafter, quarterly for the next six months if she successfully completed the remediation program, *i.e.*, with a satisfactory or better rating. See 105 ILCS 5/24A—5(h) (West 2000). Reading the statutory words "provided that" in any other way so as to blur the different time frames, as plaintiff would have us, is absurd and would violate the intent of the legislature. See, *e.g., Hearne,* 322 Ill. App. 3d at 475. According to the record, Alexander meticulously followed the School Code, evaluating plaintiff *more than* once a month during the 90-day remediation period, beginning when the plan was implemented in February 2001 until the end of the period in September 2001: February 16, March 13 *and* 22, April 3 *and* 30, May 16, September 13 *and* 26, 2001.[1]

---

[1]We note for the record that section 50.55(a)(1)(B) of the Administrative Code outlines the same evaluation time frame for schools in districts with a population over 500,000 as section 24A—5(h) of the School Code. See 23 Ill. Adm. Code § 50.55(a)(1)(B) (2000). In addition, even were our interpretation of section 24A—5(h) of the School Code to be erroneous and plaintiff's claim to be correct, the dates of Alexander's evaluations amounted to more than once every 30 days for the duration of the 90-day remediation period, with the exception of the summer months when school was not in session. Thus, either way, plaintiff's claim fails.

Moreover, the record belies plaintiff's assertions that the School Code was violated due to Alexander's failure to evaluate her at the end of the remediation period and Peterson's failure to be "available" to her from April to October 2001. According to the school calendar as provided in the record, and as was made known to plaintiff throughout the remediation process, the 90th and final day of her remediation period was September 26, 2001. Alexander did indeed evaluate her on this day, making a classroom visit and filling out an observation form. Plaintiff's insistence that her remediation period was extended to October 12, 2001, is baseless; that was merely the date on which Alexander, after meeting a final time with Peterson and making his ultimate decision, sent a letter to plaintiff informing her that she had failed to remedy her unsatisfactory rating. Similarly, from our review of the record, it can hardly be said, as plaintiff contends, that Peterson "abandoned" her duties as a consulting teacher for several weeks leaving her to "fend for herself." Plaintiff fails to point to any regulation in the School Code or anywhere else dictating how many times a consulting teacher must conduct observations or how she is to assist or provide advice to a teacher in the remediation process. The record here indicates that Peterson observed plaintiff some 14 times—slightly less than once a week. Peterson testified that she did not observe plaintiff in the months of April or May because this was the end of the school year and several students were not participating in classes due to year-end activities such as band and field trips; she believed observing plaintiff in this situation was not effective, and she believed that it was time for Alexander to see plaintiff stand on her own. The 2000-01 school year then ended, and obviously, Peterson had nothing to observe in the summer months. Peterson further testified that she made herself available to plaintiff before, during and after school in person and through e-mails and phone calls. She oftentimes rearranged her own personal schedule to accommodate plaintiff, offered the use of her computer anytime plaintiff wanted, arranged substitute teachers so plaintiff could observe her classroom, and answered every note or question plaintiff posed. Plaintiff herself admitted that Peterson offered to meet with her at some point every day. It was plaintiff who complained about after-school meetings, fell asleep during her observation of Peterson's class, did not use Peterson's computer, did not contact her during the summer months in preparation of the new school year, and simply did not implement Peterson's suggestions for better classroom management and teaching effectiveness. Even the hearing officer in this cause conceded that Peterson "was available for [plaintiff] as much as possible."

Turning briefly to plaintiff's four allegations of Administrative

*Code violations,* we note that *section 50.55,* governing the evaluation and remediation of teachers in districts with a population exceeding 500,000, refers to and tracks the language of *section 24A—5* of the School Code. Just as her School Code claims, plaintiff's claims of Administrative Code violations fail as well.

First, plaintiff's remediation plan, which she acknowledged she received and signed before it was put into effect in February 2001, clearly states only a few lines above her signature that she would be evaluated monthly for the first six months during the period and quarterly for the next six months thereafter; this is all the notification the Administrative Code requires, it was fulfilled, and plaintiff's claim of a due process violation in this regard is patently false. See 23 Ill. Adm. Code § 50.55(a)(1)(B) (2000). Second, section 50.55(b)(8) of the Administrative Code states that "the consulting teacher shall be informed, through conferences with the [principal] and the teacher under remediation, of the results of the required evaluations in order to continue to provide assistance to the teacher." 23 Ill. Adm. Code § 50.55(b)(8) (2000). Contrary to plaintiff's claim, the language in this section does not require such a conference after *every one* of Alexander's evaluations. The record reveals that Alexander had at least two such documented conferences with both plaintiff and Peterson present in addition to the initial conference when the three formed the remediation plan; this satisfies section 50.55(b)(8). Next, we find nothing improper about how Alexander completed the observation forms. Section 24A—5(d) of the School Code, not the Administrative Code, governs this, and states that the principal is to make "specification as to the teacher's strengths and weaknesses, with supporting reasons for the comments made." 105 ILCS 5/24A—5(d) (West 2000). On every one of his observation forms, Alexander made check marks in several areas under the categories of "strength," "weakness" and "does not apply," followed by a multitude of various comments in the margins as well as written in a space provided at the end of the form. Plaintiff testified that she received each form, discussed each form with Alexander and signed each form. Finally, plaintiff presents no evidence that Alexander relied exclusively on Peterson's log in making his decision to dismiss her. It is true that the Administrative Code makes clear that a consulting teacher is not to participate in the ultimate evaluation of a teacher under remediation. See 23 Ill. Adm. Code § 50.55(b)(7) (2000). However, the evidence here hardly indicates that this occurred, as plaintiff alleges. Alexander and Peterson testified that they merely discussed the notes she had kept in her log of plaintiff's progress at the end of the remediation period. In addition, even the hearing officer specifically stated that, "contrary to

[plaintiff]'s argument, Dr. Alexander, not Mrs. Peterson, made the final evaluation of [plaintiff]."

Therefore, we find that plaintiff's contention that Alexander and the Board violated her due process rights under the School Code and the Administrative Code is patently meritless.

### The E-3 Notice

Plaintiff next claims that her teaching performance did not warrant the issuance of the E-3 Notice, which initiated the entire remediation process, and that Alexander improperly evaluated her because the E-3 Notice contained more deficiencies than those he noted on his observation forms. However, as the trial court pointed out below, the issue on review in this cause is whether the Board's decision to dismiss plaintiff based on her failure to complete the remediation plan with a satisfactory or better rating is against the manifest weight of the evidence. See *O'Boyle*, 119 Ill. App. 3d at 653, quoting *Caldbeck*, 97 Ill. App. 3d at 458; see also *Hanrahan*, 174 Ill. 2d at 272. It is not our function to address the issuance of the E-3 Notice.

However, were we to do so, we find plaintiff's claim to be unsupported. For us to intervene in this respect, plaintiff must show that the Board's action (through Alexander) in issuing the E-3 Notice was "palpably arbitrary, unreasonable or capricious." *Braught v. Board of Education of Mount Prospect Public School District No. 57*, 136 Ill. App. 3d 486, 490 (1985). This is simply not the case here.

As noted earlier, the E-3 Notice Alexander issued to plaintiff contained seven failures on her part meriting an unsatisfactory rating: her failure to establish a positive learning environment for the students, maintain up-to-date student records, evaluate the students, maintain reasonable conduct, practice fairness in student-teacher relationships, use professional judgment and provide a safe and decorated learning environment. Plaintiff claims that Alexander did not detail every one of these failures in his two initial observation forms; this is incorrect and, regardless, of no consequence. Alexander had been plaintiff's supervisor for some 10 years at Pulaski. Although she received mainly good ratings in the past, Alexander had consistently noted on her evaluations that she needed to improve on her classroom skills and on implementing an assertive discipline plan to obtain student cooperation and respect. These problems were again echoed in the two evaluations preceding the E-3 Notice. After Alexander's October 19, 2000, observation, he noted that plaintiff had problems eliciting student cooperation and lacked skills in gaining their "good will." After Alexander's January 8, 2001, observation, he commented that students were ignoring her, she was not disciplining

them and her class was "out of control." In addition to these failures, Alexander noted on these two observation forms that plaintiff was not displaying student work in her classroom, her classroom was not decorated for the students and was a mess, she was not consistently using lesson plans, student assignments remained undated, her grade book was severely incomplete, and her own punctuality was weak. Furthermore, Alexander testified that in issuing the E-3 Notice, he also took into account the unusually large number of discipline cases plaintiff had been consistently sending to the school disciplinarian, noting that most of them were minor infractions she should have been handling herself as part of obtaining student respect.

It is our view that these two initial observations and evaluations clearly merited the issuance of the E-3 Notice. Every one of the seven reasons for it was accounted for in Alexander's forms in some way— forms which plaintiff reviewed and signed. Clearly, these gave her more than adequate notice of which of her behaviors needed to be remedied and improved. There was nothing arbitrary about this.

### The Remediation Plan

Plaintiff also asserts that the Board failed to prove by a preponderance of the evidence that she did not satisfactorily complete the remediation plan. She insists that Alexander resorted to "nit-picking" and "buried" his favorable remarks regarding her progress in the observation forms. She claims that these positive comments, as well as the fact that her students performed near the highest at Pulaski in standardized testing, contradicts any conclusion that she is an unsatisfactory teacher who did not complete the plan. Based on our standard of review and the record in this cause, we disagree, as there is more than ample evidence supporting the Board's determination that plaintiff failed to complete the plan. See, *e.g., Finnerty*, 303 Ill. App. 3d at 12.

Plaintiff is correct, and we do not discount, that she perhaps made some improvements during the remediation period. We recognize, as Alexander too acknowledged during several of his observation periods, that she implemented some of the plan's suggestions. These included improvements in: establishing positive learning expectations, willingness to implement new ideas, record keeping and carrying out daily routines (February 16); more complete lesson plan, understanding students, maintaining records and dividing the lesson (March 13); behavior management (April 3); asking pertinent questions about the lesson (April 30); discouraging the yelling out of answers (May 16); updating student achievement (September 13); and encouraging student growth, handling erroneous or silly answers, and engaging students in the lesson (September 26).

However, our court has held that even alleged improvement by a teacher during a remediation period does not compel the finding that the teacher's dismissal is inappropriate. See *Davis v. Board of Education of the City of Chicago*, 276 Ill. App. 3d 693, 696 (1995). It is clear from the record in the instant case that while plaintiff may have made some improvements, she still did not come close to completing the plan. The plan contained five deficiencies (no assertive discipline plan, no positive learning expectations, no up-to-date records, no professional judgment and no safe or decorated environment) and over 50 bullet point suggestions on how to remedy each of these deficiencies. Throughout the entire evaluation period, Alexander observed the recurrence of these deficiencies in plaintiff's classroom. As we outlined above, Alexander did not witness sufficient success at the end of the remediation period; rather, as time went on during these 90 days, plaintiff's failure to complete even the most basic points of the remediation plan, such as having a prepared lesson plan, a clean and decorated classroom, a complete grade book, handling minor behavioral infractions, and doing more in class than simply reviewing homework and calling on only a few students, became more prevalent instead of less so. This was even after Alexander held extra conferences with plaintiff to voice his concerns about her progress during the period. Peterson's testimony corroborates this. She stated that she noted little improvement in plaintiff's classroom management skills or her relationship with the students. She commented that plaintiff rarely taught new material and that her classes stagnated; she was not prepared and she could not control the environment, asking Peterson to discipline her very own students. Peterson further testified that plaintiff, overall, did not implement many of her suggestions, failing even to clean her desk and classroom.

Quite simply, as the Board recognized, after a 90-day reprieve which included a written detailed plan tailor-made for plaintiff to assist her in raising her rating, things in plaintiff's classroom got worse, not better. We cannot say that the opposite conclusion, namely, that plaintiff successfully completed the remediation plan, is "clearly evident" from the record here. See *O'Boyle*, 119 Ill. App. 3d at 653. Contrary to her insistence, we will not substitute our judgment for that of the Board finding her unsuccessful in this regard. See *Abrahamson*, 153 Ill. 2d at 88.

Accordingly, we find that the Board's decision to dismiss plaintiff was not against the manifest weight of the evidence.

## B. Part II: Cause

The second step in reviewing the propriety of the Board's decision

to dismiss plaintiff is to determine whether its findings of fact sufficiently support its conclusion that cause for this dismissal exists. See *Yeksigian*, 231 Ill. App. 3d at 311-12; see also *Walsh*, 96 Ill. 2d at 105. Plaintiff claims that the Board failed to prove that her dismissal was for cause.

In the context of teacher dismissal, "cause" has been defined as that which law and public policy deem as some substantial shortcoming which renders a teacher's continued employment detrimental to discipline and effectiveness. See *Davis*, 276 Ill. App. 3d at 697. A logical nexus must exist between the individual's fitness to perform as a teacher and the misconduct in question which led to her dismissal. See *Davis*, 276 Ill. App. 3d at 697. Specifically, the failure to complete a remediation plan under section 24A—5 of the School Code with a satisfactory or better rating constitutes cause for dismissal. See 105 ILCS 5/24A—5(j), 34—85 (West 2000); see also *Davis*, 276 Ill. App. 3d at 697; accord, *e.g., Powell v. Board of Education of the City of Peoria District 150*, 189 Ill. App. 3d 802 (1989). The existence of sufficient cause is a question for the Board to determine. See *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551-52 (1981). Therefore, the Board's finding of cause "commands our respect" and substantial deference, and we may not substitute our judgment for that of the Board in this regard. See, *e.g., Walsh*, 96 Ill. 2d at 105-06; *Yeksigian*, 231 Ill. App. 3d at 312. Ultimately, the Board's finding of cause can be overturned only if it is " 'arbitrary and unreasonable or unrelated to the requirements of service.' " *Yeksigian*, 231 Ill. App. 3d at 312, quoting *Allman v. Police Board*, 140 Ill. App. 3d 1038, 1041 (1986).

As we have already discussed at length, the evidence in the instant case overwhelmingly demonstrates that plaintiff failed to complete the remediation plan implemented for her. After the 90-day period, she failed to raise her rating to a level of satisfactory or better. A majority of those deficiencies noted in her classroom performance at the outset of the period remained persistent and prevalent. Her evaluations during and at the end of the remediation period were very similar to those unsatisfactory evaluations that initiated this process. Despite some minor improvements in certain deficiencies (most of which can hardly be called consistent), the record supports the Board's conclusion that plaintiff's performance was unacceptable. Additionally, there is no question here that plaintiff's chronic deficiencies were directly correlated to her ability to do her job.

Accordingly, we find that the Board's determination that cause existed for plaintiff's dismissal was not unreasonable, arbitrary or capricious. See *Davis*, 276 Ill. App. 3d at 697-98; see, *e.g., Powell*, 189 Ill. App. 3d 802.

## C. Plaintiff's Remaining Contention

■ Finally, we briefly address plaintiff's remaining contention that, because the hearing officer's recommendation to the Board to reinstate her was pursuant to "applicable authority," it must be upheld. We disagree.

First, as noted at the outset herein, the hearing officer's "recommendation" in a cause involving the dismissal of a tenured teacher is just that: a recommendation. The Board is vested with the final administrative decision on teacher removal, and it is to this decision that we are to defer. See 105 ILCS 5/34—85 (West 2000); *Hearne*, 322 Ill. App. 3d at 477 (the Board has "the final decisionmaking authority in teacher *** dismissal proceedings," and it is the Board's decision, not the recommendation of the hearing officer, which courts of law are to review). Thus, contrary to plaintiff's contention, it is ultimately irrelevant to this cause whether the hearing officer's recommendation to reinstate her was made pursuant to "applicable authority."

Nonetheless, we wish to note for the record that we cannot agree with plaintiff's presumption that the hearing officer's recommendation was based on what she terms "applicable authority." The hearing officer's recommendation was premised almost entirely on *Spangler*, 328 Ill. App. 3d 747, a case we find, as did the Board, to be clearly distinguishable from the instant cause. In *Spangler*, a tenured fifth-grade teacher received unsatisfactory ratings and was eventually dismissed by the Board because he failed to complete a remediation plan and raise his rating. A hearing officer reviewed the facts and decided that the teacher should not have been dismissed. The Board filed a complaint for administrative review, and the trial court confirmed the hearing officer's recommendation. The reviewing court on appeal affirmed, finding that, pursuant to statute, the hearing officer possessed the authority to decide all issues with respect to the dismissal decision, not the Board, and thus, the hearing officer's decision should stand. See *Spangler*, 328 Ill. App. 3d at 755.

However, the statutory provision that was applicable in *Spangler*, vesting the hearing officer rather than the Board with final authority, was section 24—12 of the School Code, which is not applicable here. Rather, it is section 34—85 of the School Code which governs the instant case because it deals specifically with those districts with populations in excess of 500,000, as is the district in which Chicago public school Pulaski is located. See generally 105 ILCS 5/34—1 *et seq.* (West 2000). Under section 34—85, a hearing officer's duty is merely advisory, concluding in a *recommendation* to the Board as to whether the teacher should be dismissed; it is then the Board, upon receipt of this recommendation, that "shall make a decision as to whether the

teacher *** shall be dismissed from its employ." 105 ILCS 5/34—85 (West 2000). Unlike *Spangler*, which involved a district of less than 500,000, the Board's decision here "is final unless reviewed" by the courts. See 105 ILCS 5/34—85 (West 2000).

Thus, *Spangler* is wholly inapposite and unsupportive of plaintiff's contention that the hearing officer, by relying principally on that case, issued something more than merely a recommendation that the Board and we are required to uphold without contest.

## CONCLUSION

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court confirming the Board's decision to dismiss plaintiff from her teaching position for cause.

Affirmed.

McNULTY and O'MARA FROSSARD, JJ., concur.