2022 IL App (1st) 211167-U

SECOND DIVISION
December 27, 2022

No. 1-21-1167

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| DAN WILLIAMS, | ) | Petition for review from a final |
| | ) | administrative decision by the Board |
| Petitioner-Appellant, | ) | of Education of the City of Chicago. |
| | ) | |
| v. | ) | Board Resolution No. 21-0728-RS13 |
| | ) | |
| THE BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO and JOSE TORRES, as Its Interim | ) | |
| Chief Executive Officer, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: We confirm the school board's decision to terminate petitioner's employment. Petitioner fails to demonstrate that the Board's findings are against the manifest weight of the evidence, and he otherwise fails to provide any basis for disturbing the Board's decision.

¶ 2    Petitioner Dan Williams appeals an administrative decision from Respondent the Board

of Education of the City of Chicago in which the school board terminated his employment.

Petitioner argues that the Board erred in several ways, and he asks that we reverse the Board's

decision to terminate his employment. We find that petitioner has failed to demonstrate entitlement to relief on appeal and, accordingly, we confirm the Board's decision.

¶ 3                                    BACKGROUND

¶ 4      Petitioner was a tenured school social worker for the Chicago Public Schools. He was assigned to Ella Flagg Young Elementary School for the 2018-2019 school year. Ella Flagg Young is a CPS school for students from kindergarten to eighth grade. In the weeks leading up to March 11, 2019, the school administration was advised that a male student, D.M., was being bullied by certain female students. On March 11, 2019, D.M. went to the office and disclosed that he was thinking about suicide because of the bullying. D.M. was a fifth grader at Ella Flagg Young Elementary School. Petitioner knew D.M. and knew about some of D.M.'s mental health struggles. Petitioner decided to stage a "mini group intervention" where he would address the female students who were allegedly bullying D.M.

¶ 5      Petitioner went to the classroom where the female students were located. A substitute teacher was in the classroom that day and the room was noisy and chaotic. Petitioner had D.M. identify the girls that were bullying him. Petitioner directed those girls to follow him, but one of the girls, J.W., refused. Petitioner grabbed J.W. by the wrist and began to pull her into the hallway. J.W. was resisting and she was crying and screaming, telling petitioner to let go of her. J.W. was left with a scratch and bruising near her wrist. J.W. was a seventh-grade girl at the school.

¶ 6      At the time petitioner got J.W. into the hallway, a teacher's assistant, Eddie Jones, arrived at the scene. Jones told petitioner to release his grip on J.W.'s arm because petitioner was holding her too tightly. Petitioner told Jones to stop interfering. Jones eventually got petitioner to

release J.W., and J.W. and petitioner were separated from each other. Jones described petitioner as being very loud and, in Jones's opinion, the girl did not need to be restrained.

¶ 7 The school's principal, Crystal Bell, and an assistant principal, Michele Sellers, arrived at the scene in the hallway shortly after petitioner and J.W. were separated. Bell and Sellers saw a lot of commotion and heard yelling and loud talking. After the administrators arrived, petitioner stated that he was "sick of this shit." Principal Bell heard petitioner tell the girls that "if [D.M.] commits suicide, it's going to be on you." Petitioner told the others present that "if something happens to [D.M.], I'm coming for all of you, I'm going to testify against you." The teacher's assistant, Jones, confirmed that petitioner said something like "if this kid does something to himself, I'm coming after all of you." Bell did not recall directing any staff members to interact with D.M. on March 11, 2019, and she did not direct petitioner to intervene with the girls accused of bullying. Sellers did not recall setting up any meeting between petitioner and D.M. on the day of the incident and she did not direct petitioner to intervene with the girls accused of bullying.

¶ 8 After the incident, petitioner returned to his office. He wrote an email to Jennifer Farrell-Rottman, the CPS Network Chief, describing the incident and his work with D.M. He complained that everybody who was there had "their hand in my intervention pot" and explained that the circumstances at the school prohibited him from working effectively. Petitioner continued that "[t]oday, I am asking that I be removed from this school Ms. Farrell Rottman. When I leave, I can leave with a clean conscious (sic) that if something happens to DM, CPS as well as [Principal] Bell & Co will be held liable." Petitioner concluded by stating "I am asking today to please have me removed. I believe the situation has devolved to a point where I can no longer be effective in this current school environment."

¶ 9　　The day after the incident, petitioner was removed from his role at the school and suspended with pay as the Board investigated the matter. About five months later, the Board initiated dismissal proceedings against petitioner. Petitioner was notified that charges of misconduct were being levied based on his conduct on March 11, 2019, and that CPS intended to move forward with proceedings to terminate his employment. CPS's chief executive officer approved 14 charges of misconduct against petitioner for his actions. A hearing was scheduled, and the parties jointly selected a hearing officer.

¶ 10　　At the dismissal hearing, Eddie Jones, Patricia Pagan, Janice Wilson, Michelle Sellers, and Crystal Bell testified about the occurrence consistent with the facts set out above, and petitioner testified on his own behalf. Petitioner testified that Sellers approached him on March 11, 2019 and informed him that D.M. was in the Principal's office and had informed someone that he was going to commit suicide. Petitioner had been working with D.M. since the beginning of the 2018-2019 school year. Petitioner met with D.M. that morning and D.M. told him that three girls had been bullying him and telling him to kill himself. Petitioner contacted D.M.'s mother. Petitioner testified that D.M.'s mother said that she had been to the school to report the bullying, but the administration was not doing anything to intervene. Petitioner made the decision to take D.M. to a classroom to identify the girls. Petitioner wanted to conduct a social work intervention by having the girls come to his office or the Principal's office to discuss the issue.

¶ 11　　Petitioner testified that when he got to the classroom that the girls were in, there was a substitute teacher and there was chaos. Petitioner tried to help the substitute teacher calm down the students. Petitioner then had D.M. follow him into the classroom to identify the girls who were bullying him. Two of the girls D.M. identified lined up by the door as instructed by

petitioner. However, the third girl, J.W. refused to comply with petitioner's directive and began shouting at petitioner. Petitioner testified that he put his right hand on J.W.'s shoulder to try to nudge her toward the door. She was screaming "don't touch me, don't touch me." Petitioner testified that J.W. threatened to hit or hurt him if he touched her again, so he "grabbed [J.W.'s] wrist gently." He grabbed J.W. by her left wrist. He then "escorted [J.W.] out [the door of the classroom] in a controlled manner," but she was resisting and screaming. Petitioner claimed that Eddie Jones arrived to meet them in the hallway and that Jones snatched J.W. away from petitioner by her right wrist, saying "let her go, let her go." Petitioner informed Jones that he was ruining the intervention and told Jones that he did not need his help. Petitioner also told Janice Wilson that he did not need her help.

¶ 12    The principal, Crystal Bell, and the assistant principal, Michele Sellers, arrived shortly thereafter. Petitioner testified that he informed the administrators on scene that they had failed to act on D.M.'s mom's complaints and he informed the administrators that they could be found liable for failing to protect such a student. He confirmed that he told the administrators that if something happened to D.M., he would be coming for them.

¶ 13    After evidence was taken by the hearing officer, the parties filed post-hearing briefs in which they argued their positions. The hearing officer issued his report in which he made findings of fact, conclusions, and a recommendation. The hearing officer made a finding that petitioner was not a credible witness in describing his actions on March 11, 2019. The hearing officer found that petitioner became agitated when his intervention was not going well and that he used excessive force when pulling J.W. out of the classroom, while ignoring her screams that he was hurting her. The hearing officer also found that petitioner engaged in misconduct when he violated D.M.'s privacy by loudly exclaiming in front of students and staff that D.M. was a

suicide risk. The hearing officer also found that petitioner was wrong to refuse his colleagues input and offers of assistance as they tried to deescalate the situation and urged him to change course.

¶ 14    The hearing officer determined that petitioner's conduct caused harm or injury to students, either psychologically or physically. He concluded that petitioner "engaged in irremediable conduct that harmed students, staff, and the school." The hearing officer further concluded that "[t]his conduct was per se irremediable and also irremediable under the two-part Gilliland standard."[1] The hearing officer determined that "[d]ismissal is appropriate."

¶ 15    The Board of Education of the City of Chicago adopted the hearing officer's findings. The Board passed a resolution terminating petitioner's employment. Petitioner filed a petition for review in this court which initiated this appeal. He now asks that we reverse the Board's decision to terminate his employment or, alternatively, remand the matter for the Board to make other considerations.

---

[1] Generally, in order to find cause for removal based on irremediable conduct, the Board must demonstrate that (1) the teacher's misconduct damaged students, faculty or the school; and (2) the misconduct could not have been corrected, even if the teacher's superiors had warned her about it. *Gilliland v. Board of Education of Pleasant View, Consolidated School District,* 67 Ill. 2d 143, 153 (1977). However, the General Assembly has provided a specific provision that governs CPS teachers and outlines certain conduct that can be considered irremediable *per se*—conduct that is sufficiently severe that its commission itself justifies the dismissal of the teacher.

> "No written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student, as that conduct is deemed to be irremediable." 105 ILCS 5/34-85(a) (West 2020).

This legislation became effective in 1995.

¶ 16                                    ANALYSIS

¶ 17     On appeal, petitioner challenges the Board's decision to terminate his employment. The

School Code provides that "[n]o teacher employed by the board of education shall … be

removed except for cause." 105 ILCS 5/34-85 (West 2020). "Cause" has been defined in this

context as considerations that the law and public policy deem to constitute a substantial

shortcoming which renders the teacher's continued employment detrimental to discipline and

effectiveness. *Davis v. Board of Education of City of Chicago*, 276 Ill. App. 3d 693, 697 (1995).

The Board has the right to determine what constitutes cause for dismissing a teacher, using the

best interests of the school as a "guiding star." *Hegener v. Board of Education of City of*

*Chicago*, 208 Ill. App. 3d 701, 725 (1991).

¶ 18     When the Board seeks to dismiss a tenured teacher, the teacher is generally entitled to a

hearing. *Dusanek v. Hannon*, 677 F.2d 538, 541 (7th Cir. 1982). At a dismissal hearing, the

hearing officer makes findings of fact and recommends whether the Board should dismiss the

teacher, and the Board then decides whether to dismiss. 105 ILCS 5/34-85(a)(6-7) (West 2020).

Where, as here, the Board adopts the hearing officer's findings of fact, they become the Board's

findings. *Prato v. Vallas*, 331 Ill. App. 3d 852, 870 (2002). On appellate review of a school

board's decision to dismiss a teacher, the factual findings from below are deemed to be *prima*

*facie* correct, and this court will not second-guess the weighing of conflicting proof from the

administrative proceeding. *Board of Education of City of Chicago v. Moore,* 2021 IL 125785, ¶

17. Under the Administrative Review Law, the proper standard of review depends upon whether

the question presented is one of fact, one of law, or a mixed question of fact and law. *Beggs v.*

*Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236,

¶ 50 (citing *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200,

210 (2008)). An administrative agency's findings of fact are considered *prima facie* true and may only be reversed if they are against the manifest weight of the evidence. *Id*. Questions of law are reviewed *de novo*. *Id*. Mixed questions of law and fact, where we analyze the legal effect of a given set of facts, are reviewed under the clearly erroneous standard. *Id*.

¶ 19 There are two issues raised by respondents concerning the form of petitioner's opening brief. Petitioner did not file a reply brief and therefore has not responded to the issues raised about his brief. Respondents point out that petitioner's brief does not include a section of "statutes involved" as required by Illinois Supreme Court Rule 341(h)(5) (eff. Oct. 1, 2020) (West 2020). Petitioner discusses and analyzes multiple statutory sections in his brief despite the absence of that part of his brief. Petitioner's brief likewise does not contain an appendix, despite record citations that appear to point to an appendix such as "(A ___ at pp. ___)" following a factual assertion. When a party fails to comply with the Supreme Court Rule governing briefs on appeal, this court may strike the brief or parts thereof, or it may disregard the noncompliant material. *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009). We agree that petitioner's brief is in technical violation of the Supreme Court Rules. The violations in his brief, however, do not hinder our review so we have elected to disregard the noncompliant portions of his brief while still addressing the issues on their merits. See *id*.

¶ 20                      I. Whether Petitioner's Conduct was Irremediable

¶ 21 The Board found the petitioner's conduct was irremediable *per se* and that, additionally, his conduct was irremediable under the *Gilliland* standard.

¶ 22 Petitioner argues that the Board erred as a matter of law when it found his conduct to be irremediable. We have observed that "[i]t is well settled that the determination of whether a cause for dismissal is irremediable or remediable is a question of fact that involves the exercise

of judgment and, therefore, lies within the discretion of the fact finder." *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 84. Thus, the proper standard for our evaluation of whether the finding on whether the conduct was irremediable is to determine if the Board's decision is against the manifest weight of the evidence or the Board acted in an arbitrary or capricious manner. *Id*.

¶ 23    When deciding whether cause exists to dismiss a tenured teacher, the Board considers whether the conduct is "remediable" or "irremediable." *Ahmad v. Board of Education of City of Chicago*, 365 Ill. App. 3d 155, 163 (2006). Irremediable misconduct is conduct that causes damage to the students, the faculty, or the school itself that could not have been corrected if warnings had been given by the teacher's superiors when they learned of the cause. *Id*. As noted earlier, the Illinois legislature has designated certain conduct as irremediable.

> "No written warning shall be required for conduct on the part of a teacher
>
> or principal that is cruel, immoral, negligent, or criminal or that in any
>
> way causes psychological or physical harm or injury to a student, as that
>
> conduct is deemed to be irremediable." 105 ILCS 5/34-85(a) (West 2020).

Remediable conduct is misconduct by a teacher, in the ordinary course of duties, which, if called to her attention, can ordinarily be remedied. *Ahmad*, 365 Ill. App. 3d at 163.

¶ 24    Before a school district can terminate a tenured teacher who engages in remediable conduct, the district must provide written notice of the misconduct and give the teacher an opportunity to remedy it. *Id*. However, a school district need not take this step if the teacher's conduct is deemed "irremediable." *Id*. Where irremediable conduct exists, the school board may move to dismiss the teacher without an opportunity to cure. *Id*.

¶ 25    Petitioner argues that the Board erred when it found that his conduct was irremediable *per se*. Petitioner relies on our decision in *Board of Education of City of Chicago v. Johnson*, 211

Ill. App. 3d 359, 365 (1991) in which we affirmed a finding that the teacher's conduct was not irremediable under the *Gilliland* standard and was not irremediable *per se*. However, this case is distinguishable from *Johnson* and the other cases petitioner relies upon to make this argument. In *Johnson*, the case was in a different posture because the hearing officer found that the Board failed to prove that the conduct was irremediable, and we held that the finding was not against the manifest weight of the evidence. *Id*. at 367. More importantly, *Johnson* was decided before the applicable legislation became effective and our decisions on irremediable conduct have markedly shifted since the statute was amended. See *Crawley v. Board of Education of City of Chicago*, 2019 IL App (1st) 181367, ¶ 19 (the petitioner's "reliance on cases issued before the 1996 School Code amendment is unavailing because these cases did not interpret the definition of irremediable conduct now contained in section 34-85 of the School Code."). Other cases relied upon by petitioner are from outside Chicago and do not involve CPS schools to whom the rule in section 5/34-85(a) exclusively applies.

¶ 26    The hearing officer in this case made express findings, supported by some evidence, that petitioner's conduct was cruel, immoral, and caused psychological and physical harm to students. Particularly, the Board made a strong case that petitioner's conduct caused psychological and physical harm to students during the confrontation at issue in this case. The Board found that petitioner caused unwarranted physical and psychological harm to J.W., and that he caused unwarranted psychological harm to D.M.

¶ 27    There was evidence to support the Board's finding that petitioner caused physical harm to J.W. by hurting her when he grabbed her wrist and removed her from the classroom. There was evidence that J.W. screamed and cried as she tried to convince petitioner to let go of her. There was evidence that petitioner caused psychological harm to D.M. by announcing to other students

and staff that he was suicidal. The Board found that petitioner degraded D.M. and caused him harm. Petitioner fails to provide any grounds for disturbing the Board's factual findings that the conduct was cruel, immoral, and caused psychological or physical harm to students. The evidence can reasonably be interpreted to meet the statutory definition for conduct that is irremediable *per se*. See *James v. Board of Education of City of Chicago*, 2015 IL App (1st) 141481, ¶ 21 (affirming the Board's finding that conduct was irremediable *per se* where the Board's finding and its underlying findings were not against the manifest weight of the evidence).

¶ 28   Moreover, the Board's decision that the conduct met the two-part *Gilliland* standard is amply supported by evidence. Under *Gilliland*, the Board must demonstrate that (1) the teacher's misconduct damaged students, faculty or the school; and (2) the misconduct could not have been corrected, even if the teacher's superiors had warned her about it. *Gilliland,* 67 Ill. 2d at 153. The Board in this case found that petitioner caused harm to students. The Board found that petitioner caused unwarranted physical and psychological harm to J.W., and that he caused unwarranted psychological harm to D.M. Those findings were supported by evidence adduced at the dismissal hearing. Further, the Board found that petitioner acted with knowing disregard for standards of reasonable conduct. The record showed that petitioner refused his colleagues' attempts to deescalate the situation. Witnesses testified that they tried to persuade petitioner to change course, but he ignored them or accused them of meddling. When Principal Bell attempted to calm petitioner down from his agitated state, he lashed out and threatened the administrators about coming for them. The Board found that all the evidence demonstrated that petitioner's misconduct damaged students, faculty or the school and that it could not have been corrected

with a warning. That finding is supported by the record and we find no basis for disturbing the Board's determination that petitioner's conduct was irremediable.

¶ 29                    II. Whether Williams Was Denied Due Process

¶ 30    Petitioner argues the Board violated his due process rights because the ALJ officer allegedly determined he should be terminated because he violated the bullying protocol, a charge that was not listed against him. The bullying protocol requires staff to take required necessary action and report instances of bullying to the administration within 24 hours on a specific written form. For that reason alone, petitioner argues the decision of the Board should be reversed.

¶ 31     In his written order, the hearing officer stated that petitioner failed to follow the bullying protocol in the Student Code of Conduct and petitioner went out on his own when he confronted the students involved in the bullying. We reject petitioner's argument.

¶ 32    First of all, the very first charge alleged against petitioner by the Board is that he failed to follow board policies: "I charge Dan Williams with: 1. Violating Corrective Action Category 'Policy Compliance: Policy Non-Compliance – Personnel' which prohibits the failure to follow Board Rules and policies."

¶ 33    Given this case arose out of complaints about petitioner's handling of a bullying incident we find a reasonable person would have been put on notice with this charge that the bullying policy was at issue. In our view, this allegation is sufficient to place petitioner on notice that it is alleged he failed to follow bullying policy. Although the record is clear that the ALJ stated petitioner failed to follow the bullying protocol by not notifying administration of the bullying, and taking action on his own, petitioner was not terminated for his non-adherence to policy. It is clear from the record petitioner was terminated because after a hearing it was determined petitioner physically accosted a student and violated confidentiality of another student causing

physical and psychological harm to students. These types of acts are deemed irremediable under State law. See 105 ILCS 5/34-85(a) (West 2020).

¶ 34    Petitioner argues that the Board violated his due process rights when it refused to consider affidavits from D.M. and his mother, and when it refused to provide identifying information for the students who witnessed the events. Petitioner explains that the hearing officer issued subpoenas for D.M. and his mother to testify at the hearing, but the addresses on the subpoena were incorrect and the witnesses did not appear. After the hearing, petitioner made contact with D.M. and his mother and obtained affidavits from them, but the affidavits were not made part of the administrative record. Petitioner claims that the affidavits from D.M. and his mother support his version of events and call into question the veracity of certain parts of Principal Bell's testimony.

¶ 35    At the hearing, neither petitioner nor his counsel raised the issue of D.M. or D.M.'s mother's absence from the hearing as reasons preventing him from presenting his case. Petitioner did not request a continuance to secure D.M. or his mother's testimony at the hearing. Petitioner likewise did not raise the issue in his post-hearing brief, despite raising several other challenges about the hearing. The hearing officer issued his findings of fact in a report to the parties. Petitioner filed exceptions to the report issued by the hearing officer, but again did not raise any issue regarding the testimony of D.M. or his mother. Petitioner waived his right to rely on testimony from D.M. and his mother when he failed to object to continuing on a number of occasions and made the choice to proceed on through the hearing without the evidence. *Cinkus,* 228 Ill. 2d at 212-13; see also 23 Ill. Adm. Code § 51.55(g) (West 2020) (a party waives any pre-hearing objection by never raising it before going ahead with the hearing). Moreover, petitioner points to nothing that the Board or the hearing officer did that deprived him of due process.

Petitioner did not protect and preserve his right to present testimony from D.M. or his mother and he has failed to demonstrate that he was denied due process.

¶ 36    Petitioner also argues that, following the hearing, he requested from the Board the names and contact information for the three girls accused of bullying D.M. Petitioner contends that he had a right to question the witnesses who were present for the events. Like above, petitioner did not act to secure testimony from the girls prior to the conclusion of the hearing and he failed to protect and preserve his right to their testimony. Moreover, petitioner fails to support this argument with any real analysis or any citation to authority and, therefore, it is forfeited. See *Vancura v. Katris*, 238 Ill. 2d 352, 369–70 (2010) (failure to adequately explain claims of error or support them with reasoned argument and citation to legal authority results in a forfeiture of the claims on appeal).

¶ 37               III. Whether the Board Erred In Making Its Factual Findings

¶ 38    Petitioner argues that the Board erred in concluding that he engaged in the misconduct outlined in the dismissal charges. In particular, he contends that the Board's finding that he grabbed or pushed J.W. causing bruises and scratches when he removed her from the classroom was against the manifest weight of the evidence. Petitioner further contends that the Board's finding that he lacked a legitimate reason for removing J.W. from the classroom was clearly erroneous and that he did not remove J.W. from the classroom in violation of CPS rules. Petitioner also contends that the Board's finding that he threatened school administrators was clearly erroneous and that the Board erred when it concluded that his refusal of assistance from his colleagues supported his dismissal.

¶ 39    The hearing officer, and by adoption, the Board, found that petitioner instigated a chaotic conflict when he decided on his own volition to stage a social intervention with the elementary

school students. The Board found that petitioner became upset that his intervention was not going as planned and he lost his composure. The Board found that petitioner's frustration resulted in him grabbing a student and forcibly removing her from a classroom as she screamed and resisted. The Board found that during this forcible removal, petitioner used unnecessary force that resulted in injuries to the girl. When petitioner's colleagues tried to assist him and to deescalate the situation, he refused their help and attempted to continue with his planned course of action. The Board found that petitioner also loudly explained that D.M. might be suicidal, disclosing private and sensitive information to the others who were gathered in the hallway.

¶ 40　As a result of petitioner's actions, the Board found petitioner caused psychological or physical harm to J.W. when he injured her arm, made her scream and cry, and scared her. The Board found that petitioner caused psychological harm to D.M. when he loudly disclosed confidential information that D.M. was having suicidal thoughts in front of others. The Board concluded that petitioners conduct was irremediable, that he caused harm to students and the school community, and that petitioner acted with knowing disregard for standards of reasonable conduct. All those findings, including the determination that petitioner's conduct was irremediable, are findings of fact. See *M.F. Booker v. Board of Education of City of Chicago*, 2016 IL App (1st) 151151, ¶ 84 (the determination of whether a cause for dismissal is irremediable or remediable is a question of fact that involves the exercise of judgment and, therefore, lies within the discretion of the fact finder).

¶ 41　For purposes of a hearing to dismiss a tenured teacher, a school board's finding of fact is within the manifest weight of the evidence if there is any proof that fairly supports it. *Raitzik v. Board of Education of City of Chicago*, 356 Ill. App. 3d 813, 824 (2005). Thus, we may not substitute our judgement for that of the Board, and reversal of the Board's decision is not

justified simply because the opposite conclusion is reasonable or because we might have ruled differently. *Id*. at 823-24. Instead, to reverse a school board's factual finding, we must conclude that the opposite conclusion is clearly evident. *Id*. at 824. In this case, we find that the Board's findings of fact were amply supported by evidence and the opposite conclusion is not clearly evident, therefore its findings are not against the manifest weight of the evidence.

¶ 42    Petitioner contends that the Board's finding that he grabbed J.W. and injured her was against the manifest weight of the evidence. Specifically, he points to conflicting testimony about what happened and some discrepancies in the witnesses' accounts of his use of force. He explains that it is possible that the mark left on J.W.'s arm was from Eddie Jones, as petitioner testified during the hearing that Jones grabbed J.W. on the wrist during the incident. Petitioner points to a DCFS investigation into the incident in which the DCFS investigator found there to be insufficient evidence to support a charge of abuse against petitioner. All of petitioner's arguments present reasons why he believes the hearing officer should have found in his favor, but the arguments fail to grapple with the standard of review or make an argument that the Board's findings are not supported by some evidence.

¶ 43    To the contrary, there was indisputable evidence that petitioner grabbed J.W. by the wrist and removed her from the classroom. He admitted as much. The conflicting evidence was on the question of how much force was used and whether it was excessive. Petitioner testified that he grabbed her gently and used minimum force. Other testimony indicated that petitioner hurt J.W. and used more force than was necessary.

¶ 44    There was evidence to support the Board's finding that petitioner used more force than was necessary and hurt J.W. The Board was not required to accept petitioner's testimony that he used the absolute minimum force. As the hearing officer expressly stated, he found petitioner not

to be credible in describing how the events transpired. The findings of fact with regard to petitioner's use of force were certainly supported by *some* evidence and there is no basis for us to find that the Board's finding of facts with regard to the use of force were against the manifest weight of the evidence.

¶ 45    Petitioner argues that the Board's finding that he had no legitimate reason to remove the student from the classroom is clearly erroneous. In support of this argument, petitioner claims that he intended to conduct a therapeutic intervention by having the three girls accused of bullying come to his office or the principal's office to discuss the situation. He claims "it was not unreasonable for [him] to believe that he was acting within his job duties when [Principal] Bell specifically asked him that morning to address the situation with D.M. He contends that his social work/crisis intervention provided him with a legitimate reason to collect J.W. and the other girls and that his use of force was justified when she refused his directives and threatened bodily harm to him.

¶ 46    However, both the principal and assistant principal testified that they did not tell petitioner to approach the girls accused of bullying. Petitioner admitted that it was his idea and that he was acting on his own initiative. He testified that the assistant principal, Ms. Sellers, brought D.M. to her office and did not give him any instructions or any more information. He testified that he had no training in restraining students or using force with students as it was something that was not a part of his job.

¶ 47    Patricia Pagan, petitioner's direct supervisor testified that she did not believe petitioner handled the situation appropriately, responding when asked if petitioner handled things appropriately that day, "absolutely not, no." She explained that social workers are not disciplinarians, so they should avoid having to restrain a child except in rare cases of necessity.

The other employees at the school who witnessed what was occurring believed that petitioner was not handling the situation appropriately and tried to intervene. Janice Wilson, the teacher from a nearby classroom testified that petitioner should have left the situation and let someone else bring the girls to him and testified that petitioner did not handle the situation appropriately. The principal, Crystal Bell, testified that petitioner did not handle the situation in an appropriate manner, and she laid out several other ways she believed would have better addressed the situation than the course of action petitioner chose. Petitioner did not notify anyone in the administration or anyone else on the staff that he was intending to confront the girls that were previously unknown to him. In the later stages of the situation, petitioner refused his colleagues offers of assistance, even as the situation devolved into chaos and petitioner became frustrated and upset. The hearing officer was not required to accept petitioner's explanation or justification for his chosen course of action. The Board's finding that petitioner lacked a legitimate basis for removing the student from the classroom was supported by evidence. See *Raitzik*, 356 Ill. App. 3d at 824.

¶ 48     Petitioner argues that the Board clearly erred when it found that he "threatened" the administration and that his statements provided cause for his termination. Principal Bell testified that when she arrived on the scene of the confrontation, petitioner was telling the students to come with him. She tried to calm him down, but he was yelling back and said something like "I'm sick of this shit." Principal Bell further testified that petitioner "was telling the young ladies that if [D.M.] commits suicide, it's going to be on you. It's going to be on you." Petitioner explains that "the evidence is also conflicting on whether there were actually any students other than D.M. in the immediate area where the statements were made." But Principal Bell testified clearly that not only were other students around; petitioner made direct statements to them about

18

potential suicide. The hearing officer weighed this conflicting evidence against petitioner and in favor of the Board.

¶ 49    Principal Bell testified that after petitioner made the statement to the young ladies, she was trying to calm petitioner down. Other teachers had arrived in the hallway and people were peeking out into the hallway and Bell asked petitioner to go downstairs with her, at which time petitioner "look[ed] at me directly and says I'm definitely—if he commits suicide, I'm definitely coming after you." Several witnesses testified similarly about petitioner making statements about D.M. as a suicide risk in a threatening manner to administrators and staff. As he does in his brief, petitioner testified that he was merely informing the administrators about their potential legal exposure. However, Principal Bell testified that she did not take the statements to be some kind of helpful advice about potential legal liability, but instead that she found the statements to make her feel nervous and question whether she was in danger. The Board rejected petitioner's characterizations of his statements and found them to be facially threatening and made in a threatening nature. The Board weighed the conflicting evidence and its conclusion on the issue was supported by evidence and by the hearing officer's observation of the witnesses and assessment of their credibility.

¶ 50    Petitioner argues that the Board clearly erred when it found his refusal of assistance from other staff members constituted cause for his termination. Multiple witnesses testified that they offered to help petitioner, tried to deescalate the situation, tried to calm petitioner down, or tried to persuade petitioner to alter his course of conduct. The witnesses testified that petitioner refused their offers of help and that he instead became more agitated that people were trying to interfere with his intervention. Petitioner contends that even if the testimony of his colleagues is

believed, the statements "do not rise to the level of conduct for which a teacher should be terminated."

¶ 51    As with other arguments in this section, however, it was not the isolated refusal of assistance that warranted petitioner's termination. Instead, it was the entire course of events that petitioner set into motion on his own initiative which were exacerbated by his rejection of the assistance offered by his colleagues. The Board does not consider each item of misconduct in isolation to determine if dismissal is warranted, but rather considers all of the misconduct together. See *Booker*, 2016 IL App (1st) 151151, ¶ 82 (conduct that may be remediable standing alone may become irremediable when combined with other conduct). All of the challenges petitioner raises in this section concern the Board's factual findings which are deemed to be *prima facie* true and correct. *Moore,* 2021 IL 125785, ¶ 17. Petitioner does not provide us with any legitimate grounds to overturn or disregard any of the challenged factual findings, but instead asks us to decide the questions differently. Of course, the standard of review does not permit such action on our part (*Raitzik*, 356 Ill. App. 3d at 824) and petitioner is not entitled to relief based on any of the arguments he raises in this section.

¶ 52                    IV. Board's Consideration of Prior Discipline

¶ 53    Petitioner argues that the Board erred when it permitted Patricia Pagan to testify about prior discipline she had issued to petitioner. He argues that the Board then erred when it considered the prior discipline in arriving at its determination that his dismissal was warranted. The prior incident in question concerned petitioner's putatively improper disclosure of confidential information. Petitioner had read aloud student IEP goals during a group session which Pagan claimed to be a breach of student confidentiality. Petitioner disputes that he did anything wrong during that incident as he claims that the students consented to the disclosure of

20

the information. The Board believed the prior incident was probative because petitioner improperly disclosed confidential information in this case, exclaiming that D.M. was a suicide risk to other students and staff.

¶ 54    Petitioner claims that the Board's conclusion about the prior discipline "was based solely on the testimony of Ms. Pagan." However, the record reveals that petitioner's alleged prior mishandling of confidential information became part of the record in a number of ways and that petitioner did not object to the other forms of proof that became part of the record to illustrate this point. For example, petitioner admitted in his pre-hearing answers that he had been subject to prior discipline. More pointedly, the disciplinary report for the prior incident was entered into evidence without objection. Petitioner himself entered evidence into the record that discussed his prior discipline for breach of student confidentiality and he testified about the matter at the hearing in this case. Thus, even if we were to assume the hearing officer erred in allowing Pagan to testify about the prior discipline, petitioner cannot complain about the Board's consideration of the matter when he failed to adequately object and then introduced the matter into the record himself.

¶ 55                    V. Evidence of Other Teacher Discipline

¶ 56    Petitioner argues that the Board erred as a matter of law when it did not consider testimony about other teachers who had been treated more favorably by the Board. Specifically, petitioner contends that he witnessed a classroom assistant at Ella Flagg Young Elementary School "grabbing a student deep in the collar." Petitioner claims that he reported the incident to CPS when it occurred. Petitioner sought records from CPS about the incident to use in this case because he believed he could show that he was being treated more harshly. Petitioner wanted to use the records in an attempt to demonstrate that the Board was discriminating against him

because he had asserted a disability, because he filed complaints with the ARDC against the Board's lawyers, because he filed federal lawsuits against the Board, and because he was contributing to a news report about why so many CPS teachers were on paid administrative leave.

¶ 57    The hearing officer ordered the Board to produce responsive documents about the classroom assistant at Ella Flagg Young Elementary School for an *in camera* review. The Board responded that it had no documents responsive to petitioner's request, which petitioner claims to be proof that the classroom assistant was never investigated or disciplined. Petitioner also sought records from the Board about the Dean at Lincoln Park High School and a teacher who had pending disciplinary charges against them. Petitioner claims that those employees were both found to be "safe" to return to work following their disciplinary proceedings and that he was being treated more harshly than those employees. The hearing officer ordered the Board to produce responsive documents about those employees for an *in camera* review. After the Board produced some responsive documents on that topic, the hearing officer reviewed the documents and rejected them from these proceedings on relevancy grounds.

¶ 58    As explained above, the Board established a non-discriminatory and non-retaliatory basis for its decision to terminate petitioner's employment. Petitioner does not make a showing of pretext for his discrimination or retaliation claim. See *Fox v. Adams & Assocs., Inc.*, 2020 IL App (1st) 182470, ¶ 63 (causation is not established if the basis for the discharge is valid and nonpretextual). Petitioner's speculation is insufficient to overcome the Board's showing. Moreover, petitioner fails to demonstrate that someone who exhibited the same or similar conduct under the same or similar circumstances was treated differently than him. His resort to his own reporting of a classroom assistant's conduct without many of the important

characteristics of this case is not probative of his alleged disparate treatment. The classroom assistant was alleged to have grabbed a student like petitioner did, but petitioner does not allege that the classroom assistant instigated the situation, hurt the student, disclosed a student's confidential information, refused the help and advice of colleagues, and became hostile with administrators. Even so, the hearing officer ordered the Board to produce documents relating to the incident, but there were no responsive documents.

¶ 59    The hearing officer entertained petitioner's request for information about the classroom assistant and about the employees from Lincoln Park High School, but found, in his discretion, that the information was not relevant. See *Board of Education of Tonica Community High School District No. 360 v. Sickley*, 133 Ill. App. 3d 921, 926 (1985) (evidentiary rulings are within the discretion of the hearing officer); see also 23 Ill. Adm. Code § 51.55(e-f) (West 2020) (providing that the hearing officer has discretion to set limitations on discovery and decide prehearing motions related to the evidence). An administrative agency's decision regarding admission of evidence is discretionary and will not be disturbed absent an abuse of discretion. *MJ Ontario, Inc. v. Daley,* 371 Ill. App. 3d 140, 149 (2007). Petitioner has failed to show that the Board improperly prevented him from presenting his claims about the discipline of other teachers.

¶ 60                    VI. Petitioner's Claim of Discriminatory Animus

¶ 61    Petitioner argues that the Board disregarded his unrebutted testimony about the discriminatory treatment he received and about the retaliation he received for his steadfast assertion of his statutory and constitutional rights. He claims that he made a *prima facie* case of retaliation, but the Board ignored the evidence he presented and failed to consider the mixed motivation for his dismissal. Petitioner draws our attention to the history between himself and

the Board and argues that the hostile relationship between the parties caused the Board to impose harsher discipline against him.

¶ 62     Petitioner does not explain which individuals had a discriminatory/retaliatory motive, how those individuals had the power to dismiss him from his employment, or what actions those individuals took as part of their supposed unlawful plan. As with his argument concerning the limitation of evidence, the Board established a non-discriminatory and non-retaliatory basis for its decision to terminate petitioner's employment. Petitioner does not make a showing of pretext for his discrimination or retaliation claim. See *Fox*, 2020 IL App (1st) 182470, ¶ 63 (causation is not established if the basis for the discharge is valid and nonpretextual). Petitioner offers only speculation that the Board was acting with an improper motive. Additionally, in this section of petitioner's brief he cites no legal authority and he fails to adequately develop his claim with reasoned legal argument. As petitioner fails to support this argument with any real legal analysis or any citation to authority, it is forfeited. See *Vancura v. Katris*, 238 Ill. 2d 352, 369–70 (2010) (failure to adequately explain claims of error or support them with reasoned argument and citation to legal authority results in a forfeiture of the claims on appeal).

¶ 63                                        CONCLUSION

¶ 64     Based on the foregoing, we confirm the decision of the Board of Education of the City of Chicago.

¶ 65     Confirmed.